NOTICE

Decision filed 05/22/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 230012

NO. 5-23-0012

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* C.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Williamson County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-45 |
| | ) | |
| Chad K., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
|     Respondent-Appellant). | ) | Judge, presiding. |

_____

        JUSTICE McHANEY delivered the judgment of the court, with opinion.
        Justices Barberis and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    At issue in this appeal is whether the trial court had personal jurisdiction to enter its December 15, 2022, default judgment finding that Chad K. (Chad) was an unfit parent and that the best interest of C.K. would be served by terminating his parental rights. We must determine if the State adequately conducted a "diligent inquiry" to locate Chad as required for service by publication pursuant to section 2-16(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-16(2) (West 2020)). If the State failed to conduct the mandated diligent inquiry to locate Chad, service by publication would not have established jurisdiction in the trial court. For the reasons that follow in this opinion, we vacate the trial court's judgment order terminating Chad's parental rights and remand the case to the trial court for further proceedings.

1

¶ 2                                    I. Background

¶ 3      C.K., a male child, was born on October 26, 2012. C.K.'s father is Chad, and his mother is Samantha K. Chad and his current wife, Emilie K. (Emilie), have a daughter, A.K., born on August 6, 2019. Although the Department of Children and Family Services (DCFS) removed both C.K. and A.K. from the home of Chad and Emilie, this appeal only involves C.K.

¶ 4      Prior to the events that resulted in this case, Chad and Emilie were involved with the DCFS in an intact family services case. On April 25, 2021, DCFS received a call from Emilie, who advised her intact family services caseworker that there had been a domestic violence incident involving Chad. She had concerns that Chad had been awake for an extended period and may have been using drugs. Emilie stated that Chad threatened to harm her and the children by blowing up the house. Emilie's caseworker advised her that she should obtain an order of protection against Chad and to contact law enforcement to have the children removed from Chad's care. DCFS investigator Melissa Ford accompanied local law enforcement officers and the DCFS intact family services caseworker to Chad's home. Ford found that Chad showed signs of being under the influence in that he was sweating profusely, his pupils were dilated, and he was jittery and shaking. Chad consented to a saliva drug test in the home that was positive for amphetamines and methamphetamine. Emilie advised Ford that she was fearful of Chad because he had threatened her with violence. Ford checked Chad's criminal background and found multiple arrests that involved violence and drugs. Ford also found that Emilie had a criminal history involving substance abuse and domestic violence. Ford then made the decision to take C.K. and A.K. into protective custody.

¶ 5      On April 28, 2021, DCFS filed its petition for adjudication of wardship. DCFS alleged that C.K. was a neglected minor due to the April 26, 2021, incident and subsequent investigation,

Chad's and Emilie's arrest histories, the intact family services case that was opened in February 2021, and multiple prior indicated reports involving Chad and Emilie.[1] The trial court also entered its shelter care and temporary custody order finding that probable cause existed for a finding that C.K. and A.K. were neglected and that, due to danger to the minor children, there was an immediate and urgent necessity to remove the minors from the home. The trial court found that reasonable efforts could not be made to prevent the children's removal from the home and granted temporary custody of the minors to DCFS.

¶ 6    An adjudicatory hearing was held on July 15, 2021. The State called three witnesses who were involved with this case. Chad and Emilie also testified.

¶ 7    Melissa Ford, the DCFS investigator, testified about the call DCFS received from Emilie reporting a domestic violence incident. DCFS had concerns regarding the safety of the children because of Chad's possible substance abuse and a reported gun in the house. During Ford's visit to Chad's home to follow up on Emilie's call to DCFS, she spoke to Emilie by phone. Emilie confirmed that her caseworker told her to call law enforcement and to seek an order of protection but that she did not do so. However, Ford testified that, after the children were removed from the home, Emilie obtained the order of protection on April 28, 2021.

¶ 8    Chad testified that there was no domestic violence incident on April 26, 2021. He stated that Emilie was not at the house because she had been with another child of hers at a sleep study in Marion. Chad testified that, when he saw text messages Emilie sent a former partner, he became angry and told her that he wanted a divorce. Thereafter, they "fought" via text messages. He denied

_____

[1]Four indicated reports were listed in the petition for adjudication of wardship: April 23, 2021—risk of physical injury and dangerous state of environment; July 12, 2019—cuts, welts, bruises, and oral injuries on C.K.; May 15, 2018—risk of harm and inadequate supervision because the children had access to pills in the household plus domestic violence; and October 27, 2017—risk of harm and injurious environment based on ongoing domestic violence.

3

that he had threatened to burn down the house on April 26, 2021. Chad admitted that he had a history of using drugs but that he last used drugs—methamphetamine—on April 6, 2021. Regarding the positive drug test from April 26, 2021, Chad testified that Melissa Ford tested him twice. Ford told him that the first test did not work and that the second test was positive. However, Ford did not show him the positive test result. He testified that any sweatiness or jittery behavior that day was the result of his nerves, not illegal drug use. Chad also testified about his June 24, 2021, substance abuse and mental health assessment at Centerstone. He stated that, at the conclusion of the assessment, no substance abuse or mental health services were recommended.

¶ 9    Emilie testified that she went to a sleep study for one of her children[2] on April 25, 2021. The next morning when the test concluded, she drove this child back to her mother's home. Emilie testified that the argument she had with Chad did not take place on April 26, 2021, but was during the period of the sleep study. She confirmed that she left C.K. and A.K. with Chad so she could accompany her child to the sleep study. She testified that she had no concerns about leaving the children with Chad that evening. Then, the morning of April 26, 2021, she and Chad started arguing in text messages. Emilie testified that she wanted to pick up A.K. and bring her back to her mother's home, but Chad refused. She stated that she did not believe that Chad was using drugs. She also stated that she never told DCFS that Chad was threatening to burn down the home. She testified that she was not afraid of Chad and that she knew that he would never hurt her or the children. However, she acknowledged that she did seek an order of protection after this incident.

¶ 10    Emilie St. Peter, a Lutheran Social Services intact family supervisor, next testified about her interactions with Emilie on April 26, 2021. St. Peter testified that on April 26, 2021, her coworker, Joe Howerton, received a call from Emilie. St. Peter was present when the children were

---

[2]Emilie has two older children, both of whom are in the custody of family members.

removed from Chad's care. She testified that Melissa Ford gave Chad one saliva drug test and that, given her social work education and experience, she believed that Chad was under the influence that date. St. Peter was present when Ford spoke with Emilie by phone, and she confirmed that Emilie told Ford that she thought Chad was under the influence. St. Peter testified that the intact family services case was not immediately processed at Lutheran Social Services until late March or early April 2021. She indicated that Chad and Emilie had not yet begun services in the intact family case but that Emilie had registered for domestic violence services through the Women's Center.

¶ 11     Joe Howerton was next called to testify. He testified that he was an intact family services caseworker with Lutheran Social Services. On April 26, 2021, at approximately 8:30 a.m., Howerton received a phone call from Emilie, who expressed her fear and informed Howerton that Chad would not allow her to take her daughter, A.K., and had threatened to burn down the house. Howerton explained that Lutheran Social Services had received the case about two weeks before he received the April 26, 2021, phone call.

¶ 12     At the conclusion of the hearing, the trial court found that C.K. was neglected and in an environment injurious to his welfare. The court noted the ample supporting evidence for these findings. There had been a recent DCFS intact family services case opened for this couple. The couple had a substantial history of involvement with DCFS including past drug use and a domestic violence history. The order of protection Emilie obtained within two days of the April 26, 2021, incident contradicted her adjudicatory hearing testimony. The court noted that the Centerstone evaluation "comically" found that Chad was not actively using and required no substance abuse services, while Chad testified at the hearing to using methamphetamine on April 6, 2021. The court found that the positive drug test obtained by DCFS on April 26, 2021, was corroborative of the

5

allegations Emilie made in the phone call to her intact family services caseworker that same date. Following its ruling, the trial court directly addressed DCFS caseworker Kadie Lind, who was assigned to the case. The court noted its concern with the Centerstone substance abuse evaluation and suggested that random drug testing should be utilized in this case.

¶ 13    On August 26, 2021, the trial court held the dispositional hearing. The court heard testimony from DCFS caseworker Kadie Lind and Chad.

¶ 14    Lind testified that she worked for Caritas Family Solutions and was assigned in April 2021 as the DCFS caseworker for Chad and Emilie. She explained that she met with the parents and created a service plan. Chad was to undergo a mental health and substance abuse assessment and comply with any recommended services and to participate in domestic violence and parenting services. Additionally, Chad was required to maintain safe and stable housing and obtain and maintain a legal source of income. As of the date of the hearing, Chad had not completed any of these services. Lind testified that Centerstone had recommended substance abuse services. However, because Chad's insurance would not cover these services, no services were available at Centerstone. On cross-examination by Chad's attorney, Lind explained that the Centerstone counselor had phoned her and explained that although services could have been provided, since insurance would not cover those services, Centerstone would not be officially recommending services. Chad had taken one drug test at Centerstone that was negative. That negative result was purportedly the reason that insurance would not pay for substance abuse services, because there was no medical necessity for the services. Lind testified that Chad was in parenting services. As of the date of the hearing, Chad was living in the Herrin home with Emilie. He reported that he had a job but had not yet provided verification.

¶ 15    Chad also testified at the dispositional hearing. Chad confirmed that he was currently enrolled in parenting classes and had been employed with a family member's masonry business since April 2018. He acknowledged that he had recently missed some work due to a heart condition. Chad disputed that the Centerstone counselor recommended any substance abuse services and testified that there had been no mention of insurance being an issue. On cross-examination, he stated that he had informed the Centerstone counselor that he had used methamphetamine on April 6, 2021. Chad testified that Lind advised him that he had to engage in domestic violence services through the Carbondale Police Department. He explained that he called on May 1, 2021, but that the class was full and that another class would not open for 16 weeks.

¶ 16    At the conclusion of the hearing, the trial court again expressed concern about the lack of recommended substance abuse services for Chad. The court also directed Lind to find an alternative domestic violence class for Chad. The written dispositional order was entered on August 26, 2021, wherein the court found that Chad was not currently fit to care for C.K. and that placement with Chad would be contrary to the health, safety, and best interest of C.K. The court made C.K. a ward of the court and placed custody with DCFS. The court allowed Chad to continue with supervised visits.

¶ 17    DCFS filed its family service plan dated September 14, 2021. DCFS reported that C.K. asked to talk to someone about his experiences in living with Chad. DCFS referred him for counseling services. C.K. informed caseworker Lind that he did not want to continue visitation with Chad and that the only reason he attended was so he could see his sister, A.K. DCFS referred Chad to Carbondale Counseling Associates for substance abuse services, but those services had not yet started. Chad started domestic violence services in mid-September 2021, but the services were not yet completed. His parenting services were also in process and not yet complete.

7

¶ 18    DCFS filed its permanency hearing report with the court on November 15, 2021, stating that its permanency goal was to return C.K. home to Chad within five months. DCFS reported that Chad had made satisfactory progress and reasonable efforts toward the goal of bringing C.K. home. Chad had complied with all random drug testing requests, and all tests as of that date had been negative. DCFS had attempted to find another substance abuse provider at the trial court's request, as Centerstone would not allow Chad to engage in services unless he was currently using or admitting to substance abuse. DCFS's attempts to find an alternate provider were unsuccessful either because the provider was not taking new referrals or would not accept the DCFS rate of payment. Chad had completed parenting classes and was enrolled and attending domestic violence classes. Chad continued to live with his wife Emilie in their Herrin home. DCFS conducted a home safety check regarding the Herrin home and found no concerns. Visitations were supervised, but DCFS reported that Chad's visits with C.K. were going well.

¶ 19    On December 9, 2021, the trial court entered a permanency order finding that the appropriate permanency goal was to return C.K. home within 12 months—not 5 months. The court found that Chad had made reasonable efforts and substantial progress toward this goal. On this same date, the trial court entered an order directing DCFS to provide family counseling services for Chad and C.K.

¶ 20    DCFS filed its next family service plan with the court on April 7, 2022. DCFS reported that A.K. was returned to Emilie on January 28, 2022, but in mid-February, Emilie and A.K. had to leave the Herrin home because Chad had not completed his services. Emilie and A.K. moved in with Emilie's mother in her Carterville home. Emilie reportedly stated her commitment to the safety plan and informed DCFS that she did not want to do anything that could disrupt A.K.'s placement with her. As of the date of the report, DCFS relayed that Chad had completed most of

8

the services mandated by his plan and had made significant process overall with just a few sessions remaining to complete his domestic violence service objective.

¶ 21    On April 11, 2022, DCFS filed its next permanency report. DCFS reported that in February 2022, Chad relapsed. Chad was admitted to Carbondale Memorial Hospital on February 7, 2022, with withdrawal symptoms from fentanyl. Upon his release, Chad enrolled himself in outpatient substance abuse services through the Gateway Foundation in Carbondale. DCFS spoke with a Gateway Foundation provider who reported that Chad had been attending group counseling sessions four times per week for several weeks. However, on March 11, 2022, Chad tested positive for amphetamines and methamphetamine. The Gateway Foundation asked Chad to speak with a counselor about this positive test result, but he refused, claiming that he would find a different program for rehabilitative services. A Gateway Foundation representative informed DCFS that Chad was currently in a short-term program, but he would need to transition to a longer-term program lasting three to four months. Ultimately, Chad resumed counseling services at the Gateway Foundation. Chad had successfully completed other required services, except for the court-ordered family counseling. DCFS reported that Chad had only attended one of nine counseling sessions with C.K. Overall, DCFS was concerned with Chad's relapse and its potential inability to monitor his substance abuse. The recommended permanency goal was to return C.K. home within 12 months.

¶ 22    A permanency hearing was held on April 21, 2022. Emilie's attorney informed the trial court that his client intended to remain with Chad and to provide a support system for him but that she and A.K. were currently living with her mother. Chad's attorney informed the court that Chad was still engaged in an outpatient rehabilitation program since his February 2022 relapse but that he had completed all other services. The trial court determined that the goal of returning A.K.

9

home to Emilie had been achieved and granted custody and guardianship of A.K. to Emilie. The court advised Chad and Emilie that Emilie should not allow unsupervised visits between Chad and A.K., as his services were not completed at that time. The trial court commended Chad for completion of his services in this case and encouraged him to continue working on his substance abuse issue. The trial court's order found that Chad had made reasonable efforts and "some" progress with a goal to return C.K. to Chad's care within 12 months.

¶ 23    On September 6, 2022, DCFS filed its next permanency hearing report. DCFS reported that Chad had demonstrated reasonable progress and efforts toward returning C.K. home. However, the report also contained information that reflected DCFS concerns about Chad's progress and commitment. On the date of the previous hearing—April 21, 2022—Chad submitted to a DCFS-required drug test and tested positive for methamphetamine and amphetamines. Four more drug tests were scheduled during June and August 2022. Chad missed three of them and tested negative on the fourth test. Similarly, the Gateway Foundation, where Chad engaged in substance abuse counseling, also mandated drug tests. Chad missed some of these drug tests and tested negative on the two he did complete during the summer of 2022. The Gateway Foundation reported that Chad was only attending one group counseling session per week and that he really needed to be attending twice per week. Overall, the Gateway Foundation recommended that he continue with the group counseling program for one to two additional months. DCFS also reported that Chad was inconsistent with attendance of family counseling sessions with C.K. DCFS noted that Chad's employment status was unclear in that he indicated he was no longer working for the masonry company but had a new employer. As of the date of the report, Chad had not provided new employment information to DCFS. DCFS stated that the Herrin home where Chad lived met DCFS requirements for stable housing. DCFS stated that the case fits the legal screening criteria.

10

¶ 24    On September 22, 2022, the trial court held a permanency hearing. Chad did not appear, and his attorney informed the trial court that she had not spoken to him since April 2022. However, DCFS caseworker Kadie Lind, who was present at this hearing, informed the court that she spoke to Chad by phone the previous day and that he stated that he would attend the hearing. During that conversation, the worker learned that the Herrin home where Chad lived was owned by Emilie's father. Chad advised DCFS that his father-in-law wanted him to move out of the house because Emilie and A.K. were not then living there with Chad. The court questioned why DCFS's permanency report still maintained that the goal was to return C.K. home to Chad within 12 months. Lind reported that her supervisor had recently directed her to submit the case to legal screening. Lind also reported that she had provided the foster parent with the permanency commitment paperwork. Until the legal screening was complete, DCFS was unable to change the recommended permanency goal. At the conclusion of the hearing, the trial court found that the appropriate goal was "return home pending status." The court supported this goal by stating that Chad "has failed drug tests, needs further counseling, is not employed, amongst other issues." The court set the next hearing for December 15, 2022.

¶ 25    DCFS filed its next family service plan on October 4, 2022. DCFS reported that Chad tested positive for fentanyl on a September 14, 2022, scheduled drug test through the Gateway Foundation. DCFS noted that the permanency goal was recently changed to "return home pending status," noting the next court hearing date of December 15, 2022. DCFS noted that Chad had not yet provided any documentation supporting his alleged employment. His former employer, Dwyer Masonry, informed DCFS that Chad had only worked approximately three weeks in 2021 and had not worked at all as of the date of the report in 2022. DCFS reported that Chad maintained stable housing. Chad continued to engage in substance abuse services through Gateway Foundation. The

11

family counseling sessions had recently been placed "on hold" but were scheduled to restart in the "next few months."

¶ 26 On November 30, 2022, the State filed its petition for termination of Chad's parental rights. Chad's last known address was listed as the Herrin home. The State alleged that Chad was an unfit person on four bases: (1) the failure to maintain a reasonable degree of interest, concern, or responsibility as to C.K.'s welfare; (2) the failure to protect C.K. from conditions within his environment that are injurious to his welfare; (3) the failure to make reasonable efforts to correct the conditions that were the basis for C.K.'s removal during any nine-month period following C.K.'s adjudication; and (4) the failure to make reasonable progress toward C.K.'s return during any nine-month period following C.K.'s adjudication. The State alleged that it was in C.K.'s best interest that Chad's parental rights be terminated.

¶ 27 DCFS filed its permanency hearing report on December 1, 2022. DCFS noted that on November 3, 2022, Emilie advised DCFS that she would be seeking a divorce from Chad. At the next supervised visitation in November, Chad confirmed to DCFS that Emilie planned to divorce him. Thereafter, on November 18, 2022, Chad called his DCFS caseworker and left a voicemail. Chad informed his caseworker that Emilie was planning on seeking an order of protection to force him to leave their Herrin home. Chad asked his caseworker if she could obtain a court order directing Emilie to continue living in Carterville with her mother, so that he could remain in the Herrin home. DCFS indicated that it returned Chad's phone call "the following week"[3] and left

---

[3]From a review of the 2022 calendar, the "following week" would have been the week of November 21, 2022. Time and Date Calendar, https://www.timeanddate.com/calendar/?year=2022&country=1 (last visited May 19, 2020) [https://perma.cc/8DM6-EFTN]. In order to fully understand the timeline of actions noted and/or taken by DCFS and the State, we take judicial notice of the 2022 calendar dates. See *People v. Hawkins*, 284 Ill. App. 3d 1011, 1015 (1996) (citing *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 902 (1990)).

12

him a voicemail that there were no orders in this case setting forth where Chad and Emilie could live. In this December 1, 2022, report, DCFS noted that Chad had not returned DCFS's call. DCFS concluded its permanency hearing report stating that "the agency is currently unaware of [Chad's] location or if he is still living in the home in Herrin, IL."

¶ 28    On December 1, 2022, the State filed its affidavit for service by publication, stating that Chad "cannot be found within this state, or has left this state and cannot be located, so that process cannot be served upon him either personally or by certified mail. The present [Herrin] address *** cannot be ascertained upon diligent inquiry." The Stated listed Chad's last known address as the Herrin marital home. On this same date, the State sent a letter, enclosing a notice of publication, to the Herrin Independent in Marion asking that the notice be published in one edition of the paper. Also on this same date, a summons was issued to be served upon Chad at his Herrin address.

¶ 29    On December 7, 2022, Officer M. Byrne of the Williamson County Sheriff's Department attempted to personally serve Chad at his Herrin address. Notes from the officer indicated that he had not found Chad at that address but that he left "notice" at that address. The officer also noted that Chad did "not live there." The return of service was filed on December 14, 2022.

¶ 30    On December 8, 2022, the Marion Star newspaper published the notice of the December 15, 2022, termination hearing. The certificate of publication was filed on December 13, 2022.

¶ 31    On December 15, 2022, the trial court held the hearing on the State's petition to terminate Chad's parental rights. Chad did not appear, but his attorney was present. The court found that the summons to Chad was returned unserved at the last known address the court had on file and accepted the publication notice as satisfactory. The court then entered its order terminating Chad's parental rights by default, stating as follows:

13

"I would note that this is an Order by Default. Certainly, parents have rights, if they wish, to request to vacate that within 30 days in the event that they decide to avail themselves of this Court and the process. But at this point, Termination Order will be entered, Permanency Order entered, and goal changed to adoption."

¶ 32 Chad timely filed his notice of appeal from this order. Chad's attorney sought leave to withdraw, which the trial court granted on January 25, 2023.

¶ 33                                            II. Analysis

¶ 34 At issue in this case is whether the trial court obtained personal jurisdiction over Chad pursuant to service by publication. Without personal jurisdiction, the trial court's order terminating Chad's parental rights would be void. Chad argues that the State did not conduct a diligent inquiry to ascertain his address or whereabouts, and thus, service by publication was improper and could not have conferred personal jurisdiction on the trial court. We agree.

¶ 35 We review the legal issue of whether the trial court obtained personal jurisdiction over a party on a *de novo* basis. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010)). "If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d 408, 414 (2009). Moreover, if the trial court does not obtain personal jurisdiction over a litigant, the court is "deprived of the authority or power to impose judgment against the litigant." *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re M.W.*, 232 Ill. 2d at 428).

¶ 36 Termination of parental rights involves a fundamental liberty interest. *Id.* ¶ 61 (citing *In re M.H.*, 196 Ill. 2d 356, 363 (2001)). Therefore, the process used by the State must be in compliance with due process rights. *Id.* To obtain personal jurisdiction, the party must have been served with

summons, which provides "a means of protecting an individual's right to due process by allowing for proper notification of interested individuals and an opportunity to be heard." *Id.* (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). If service of process is inadequate, the trial court does not have personal jurisdiction. *Id.*

¶ 37    The Juvenile Court Act of 1987 (Act) provides the processes to obtain service on a parent. See 705 ILCS 405/2-15, 2-16 (West 2020). Section 2-15 states that when a petition is filed, the court must issue a summons with a copy of the petition attached. *Id.* § 2-15(1). The summons then must be served "by any county sheriff, coroner or probation officer" by leaving a copy with the person named in the summons, or by leaving a copy at his or her usual place of abode with a family member or with any person who lives at the address and is over the age of 10, and then mailing a copy to the person named in the summons. *Id.* § 2-15(4), (5). Personal service must be made at least three days before the date of hearing. *Id.* § 2-15(5).

¶ 38    If the State is not able to obtain personal service upon the parent pursuant to section 2-15 of the Act, there are two other options. The first alternative is to serve the parent by certified mail if personal service pursuant to section 2-15 was not made "within a reasonable time or if it appears that any respondent resides outside the State." *Id.* § 2-16(1). If this option is used by the State, the return receipt constitutes proof of service. *Id.* The second alternative is service by publication. *Id.* § 2-16(2). Section 2-16(2) provides specific guidelines for when and how service by publication can be utilized:

> "Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. The Department of Children and Family Services shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department. If, after diligent inquiry

15

made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service. *** [T]he court may not enter any order or judgment against any person who cannot be served with process other than by publication unless notice by publication is given or unless that person appears." *Id.*

Based upon its express wording, section 2-16(2) "contemplates a trial court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address." (Emphasis in original.) *In re Dar. C.*, 2011 IL 111083, ¶ 64.

¶ 39     As the Illinois Supreme Court noted in *In re Dar. C.*, section 2-16(2) does not define the term "diligent inquiry." *Id.* ¶ 65. Quoting caselaw and the Webster's Third New International Dictionary, the court stated that the standard for a diligent inquiry was " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make' " (*id.* (quoting *In re Sheltanya S.*, 309 Ill. App. 3d 941, 956 (1999))) and " 'characterized by steady, earnest, attentive, and energetic application and effort in a pursuit' " (*id.* (quoting Webster's Third New International Dictionary 633 (1993))). In *In re Dar. C.*, the court concluded that the State did not make a diligent inquiry and, thus, service by publication was not appropriate. The court noted that the State and DCFS primarily, if not completely, relied upon entering the respondent's name into various computer databases and then mailing letters to potential address

16

matches and on asking the children's biological mother if she knew where the respondent lived. *Id.* ¶ 67. The court concluded that the record established that the State did not conduct any search or investigation to ascertain the respondent's contact information, despite a "number of opportunities" that were available. *Id.* ¶ 75. The court noted that DCFS was aware that the respondent lived in the Chicago area and had multiple possible address matches, including where his sister and parents lived, but DCFS employees "did not visit or inquire at any of the potential address matches in the area." *Id.* ¶ 76. DCFS was also aware that the mother of the children was receiving Social Security disability income, but no one investigated to determine whether the respondent was the source of the income. *Id.* ¶ 78. A DCFS worker was present during a supervised visitation with the biological mother when the respondent called, but DCFS did not ask the mother for the respondent's phone number. *Id.* ¶ 79. After consideration of the missed investigative opportunities, the court stated:

> "In our view, the diligent inquiry of section 2-16(2) necessarily requires a good-faith attempt at acquiring the contact information of a parent whose whereabouts are unknown, including inquiry about potential leads on the parent's whereabouts. When, as here, the State and the Department possess information that reasonably could be relied on to discover a missing parent's location with further investigation, we believe that a diligent person intent on locating the parent would perform that investigation." *Id.* ¶ 81.

¶ 40    Here, the State simultaneously issued a summons for in-person service, attempted to serve Chad by certified mail, and filed its affidavit for service by publication. As stated earlier, the in-person summons and the affidavit for service by publication were both instigated/filed on December 1, 2022. The Williamson County circuit clerk sent Chad a copy of the summons and petition by certified mail on December 5, 2022. The certified mail notice was not received by or

17

picked up by Chad and was returned to the clerk's office and filed with the court on January 18, 2023.

¶ 41    Reviewing the timing of the service attempts, along with the information provided by the State in its affidavit for service by publication, we find no evidence that an inquiry was made to locate Chad, let alone a *diligent* inquiry. The State filed its petition to terminate on November 30, 2022, and maintained the setting for the hearing for December 15, 2022. On December 1, 2022, the State obtained a summons to have Chad personally served but also sought to have him served by publication. The affidavit filed by the State on December 1, 2022, failed to include the required detail about diligent search efforts to locate Chad, which is necessary to warrant service by publication. 705 ILCS 405/2-16(2) (West 2020).

¶ 42    Looking further into the wording of section 2-16(2) of the Act, we note that part of the requirement for a mandated "diligent inquiry" prior to attempting service by publication is included in the statute itself. "The Department of Children and Family Services shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department." *Id.* DCFS adopted a procedural manual precisely on the issue of diligent searches, dated June 1, 2003, and titled "Administrative Procedure #22, Diligent Search." See Ill. Dept. of Children & Family Services, Administrative Procedure #22, Diligent Search, https://dcfs.illinois.gov/content/dam/soi/en/web/dcfs/documents/about-us/policy-rules-and-forms/documents/admistrative-procedure/admistrative-procedure-22.pdf    (June    1,    2003) [https://perma.cc/96CL-VSPK]. Section 22.4(d) of the manual provides detailed directions for a diligent search necessary for service by publication for purposes of termination of parental rights. Although lengthy, we believe that a full recitation of section 22.4(d) is appropriate given the facts in this case.

18

"When it is necessary to do a diligent search for purposes of termination of parental rights, in order to ensure that the diligent search meets the requirements of the Juvenile Court Act to support the notice by publication, it should have been done no more than *six months* in advance of the screening date.

In addition, when conducting diligent searches for the purpose of termination of parental rights, adoption, or subsidized guardianship, the following tasks are mandatory, and it is recommended that they be completed in the order listed:

1) Review the complete file: Your agency's file may have information regarding the identity of a parent whose identity is currently unknown. In addition, you may find information regarding relatives who may be able to assist you in your search. Be sure to check the Social Investigation done at time of disposition for addresses.

2) You *must do an in-person visit* to the parent's last known address and *confirm whether or not the individual actually resides there*. \*\*\*

3) Relatives: Ask any available parent and relatives about names and addresses of the missing parent. Obtain as much information as you can from any relatives that you can find or have contact with. Relatives may have information as to where the parent is now residing. Document your conversations and any information you receive. You must do this again *NOW*, even if it was done before.

4) Public Aid search and printout: Do a public aid computer search if the parent is known to have last resided in Illinois. Check the MARS/CYCIS CR08 and CR03 screens for names similar to the parent's name. Use the date of birth, if available (from child's birth certificate). If there is a match, send a letter to the

19

person at the address shown. *** Send the letter by regular mail. Attach a copy of the letter and envelope. If there is no response to the letter, provide the information to the DSSC in the Search Request Form.

5) Review the complete court file. The court file may have information regarding the identity or address of a parent that is currently unknown. In addition, you may find information regarding attorneys who represent parents, or relatives who may be able to assist you in your search.

6) Do a jail check. Call the local County Jail *** and Illinois Department of Corrections. *NOTE Jail/DOC check must have been done within 48 hours of the first legal screening date and each subsequent legal prescreening and legal screening date and within 24 hours of the publication/default T[ermination of] P[arental] R[ights] hearing.*

Do a telephone book search: copy page from phone book of the city/town where parent(s) believed to reside. Check for exact or similar names and initials." (Emphases in original.) *Id.* § 22.4(d).

¶ 43 What is apparent from the steps outlined by DCFS is the care and thoroughness required when the State is seeking to terminate parental rights. This level of thoroughness is appropriate because terminating a parent's rights to his child impacts a fundamental liberty interest. *In re Dar. C.*, 2011 IL 111083, ¶ 61 (citing *In re M.H.*, 196 Ill. 2d at 363). The Illinois legislature through the Juvenile Court Act directed DCFS to "adopt rules defining the requirements for conducting a diligent search." 705 ILCS 405/2-16(2) (West 2020). In turn, DCFS adopted very detailed rules for its workers when attempting to locate a missing parent. See Administrative Procedure #22, Diligent Search, *supra*. We return to the facts of this case to determine if DCFS conducted a

diligent search to locate Chad sufficient to warrant service by publication.

¶ 44     From our review of the record, Chad lived in the Herrin marital home until mid-to-late November. Chad left a voicemail for his caseworker on November 18, 2022. As of that date, Chad was living at this Herrin home. The caseworker returned that call sometime during the following week of November 21, 2022. We know that Emilie had stated her intent to divorce Chad and that Emilie's father owned the Herrin house. When Chad called the caseworker on November 18, 2022, he said that Emilie was planning on seeking an order of protection to force him out of this Herrin house. The record is silent about whether Emilie filed that petition for an order of protection and, if so, on what date. DCFS indicated in its December 1, 2022, permanency hearing report that Chad's whereabouts were then unknown. No additional details were included in the report. On December 1, 2022, the State filed its affidavit for publication of service containing boilerplate language to the effect that Chad "cannot be found within this state, or has left this state and cannot be located." Section 2-16(2) of the Act requires the petitioner filing this affidavit to "state what efforts were made to effectuate service." 705 ILCS 405/2-16(2) (West 2020). The State's affidavit contained no detail about efforts made to effectuate service. The State asserted that Chad could not be served by personal service or certified mail, but the record reflects that the State had not attempted to do either as of December 1, 2022. However, on the same date that the State said it could not find Chad and was unable to serve him personally, a summons was issued directed to Chad at the Herrin address and sent to the Williamson County Sheriff's Department for service. Ultimately, on December 7, 2022, the Williamson County Sheriff's Department attempted to personally serve Chad at this Herrin address, but he was not there.

¶ 45     From that information alone, DCFS knew where Chad lived at least as of the date he left his voicemail for his DCFS caseworker. More importantly, DCFS had Chad's telephone number,

21

because DCFS called Chad during the week of November 21, 2022. The record includes no documentation that Chad's DCFS caseworker contacted or attempted to contact him by phone to ascertain if he had moved, or where he had moved, in late November 2022.

¶ 46     The record is also silent about whether DCFS and/or the State availed themselves of these databases to see if a new address would somehow show up in the approximate one to two weeks that Chad's address became unknown.

¶ 47     Chad shared a child with Emilie, and they were still presumably married, as Emilie had only started talking about seeking a dissolution of the marriage in November 2022. The record is silent about whether DCFS reached out to Emilie to find out where Chad was living.

¶ 48     In its "diligent search" administrative manual, DCFS clearly states that a parent's relatives are a primary source of information about a parent's whereabouts. Here, the record is silent about whether DCFS contacted any of Chad's relatives for information. In this case, C.K.'s foster placement was with a relative. Chad's mother Wanda was C.K.'s foster parent. DCFS could have easily sought information about Chad's location from his mother, as DCFS had Wanda's contact information. However, the record is devoid of any documentation that DCFS communicated with Wanda or any other relative to ascertain Chad's whereabouts.

¶ 49     We conclude that the State and DCFS have failed to establish that they made a diligent search to locate Chad pursuant to section 2-16(2) of the Act (705 ILCS 405/2-16(2) (West 2020)). Without evidence of a diligent search, there was no legal justification to proceed with service by publication. We find that service by publication was improper and defective and, thus, the service by publication did not provide the trial court with personal jurisdiction. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re M.W.*, 232 Ill. 2d at 428). Without personal jurisdiction, the trial court was "deprived of the authority or power to impose judgment against the litigant." *Id.*

22

¶ 50                                    III. Conclusion

¶ 51    For the foregoing reasons, we vacate the judgment of the Williamson County circuit court

terminating Chad's parental rights and remand for further proceedings.

¶ 52    Vacated and remanded.

*In re C.K.*, 2023 IL App (5th) 230012

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 21-JA-45; the Hon. Amanda Byassee Gott, Judge, presiding. |
| **Attorneys for Appellant:** | Frances E. Salimi, of Marion, for appellant. |
| **Attorneys for Appellee:** | Ted Hampson, State's Attorney, of Marion (Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Teresa A. Machicao Hopkins, of Machicao & Associates, of Marion, guardian *ad litem*. |