NOTICE

Decision filed 06/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260117

NO. 5-26-0117

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* ALICE D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois. | ) | Effingham County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 23-JA-1 |
| v. | ) | |
| | ) | |
| Michael J., | ) | Honorable |
| | ) | Bryan M. Kibler, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court, with opinion.
Justices McHaney and Clarke concurred in the judgment and opinion.

**OPINION**

¶ 1 The respondent, Michael J. (Father), appeals an order of the circuit court of Effingham County denying his motion to vacate a default order terminating his parental rights after service by publication on "any and all unknown fathers." Father argues that the circuit court lacked personal jurisdiction over him during the termination proceedings, thereby rendering the termination order void because (1) the State failed to perform a diligent inquiry before attempting to effectuate service by publication and (2) the form of the notice published did not comport with the statutory requirements. Alternatively, Father contends that the circuit court abused its discretion in denying his motion for relief because he demonstrated the existence of a meritorious

1

defense in the underlying juvenile proceeding and due diligence in presenting his claim. We reverse.

¶ 2                                    I. BACKGROUND

¶ 3     The minor at the center of this appeal, Alice D., was born in late January 2023. On February 3, 2023, the State filed a petition for adjudication of wardship and a motion for temporary custody. The petition named Christine D. (Mother) and Christopher Mills as the minor's legal parents and designated them as respondents. Neither Mother nor Mills are a party to this appeal. The State alleged that the minor was neglected due to being in an environment injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)).

¶ 4     The matter came for a shelter care hearing on the same date. Mother agreed to temporary custody, and Mills did not object. Pursuant to the State's request, the circuit court ordered Mills to cooperate with DNA testing to determine whether he was the minor's biological father. The circuit court entered orders placing the minor in the temporary custody of the Department of Children and Family Services (DCFS) and directing Mills to submit to DNA testing to determine paternity.

¶ 5     On May 17, 2023, a copy of a lab report was filed with the court. The report indicated the possibility that Mills was the minor's father was 0.00%. On the same date, the circuit court held a status hearing. The State informed the circuit court that Mills was not the minor's father. The State indicated it was ready to proceed to the adjudicatory hearing, but noted, "If there is someone else that the mother indicates could be the father, then that person could be tested." The circuit court asked the State, "Do you have to publish or have you already done that?" The State replied, "If we could build in enough time, I think that may be appropriate." The matter was set for an adjudicatory hearing on August 16, 2023.

¶ 6     On May 25, 2023, the State filed an affidavit for service by publication and a notice of publication. The affidavit stated, "Each respondent named below cannot be found within this State, or has left this State and cannot be located, so that process cannot be served upon him either personally or by certified mail. The present address of each respondent named below cannot be ascertained upon diligent inquiry." The affidavit then listed the respondent as "unknown." On June 8, 2023, a certification of publication was filed certifying that the notice was published in the Effingham Daily News on June 2, 2023. The notice advised "Any and all Unknown Fathers of A.D." that a petition for adjudication of wardship had been filed and that an adjudicatory hearing would take place on August 16, 2023. It further provided information on the time and location of the hearing.

¶ 7     On August 16, 2023, the circuit court held an adjudicatory hearing, following which it entered an order adjudging the minor neglected, finding that the neglect was inflicted by Mother, and setting the matter for a dispositional hearing. On September 13, 2023, the matter came for a dispositional hearing, following which the circuit court entered an order finding that Mother was unable to care for the minor and making the minor a ward of the court.

¶ 8     On August 2, 2024, the State filed a motion for termination of parental rights. The State alleged that Mother was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare (750 ILCS 50/1(D)(b) (West 2022)); failure to make reasonable efforts to correct the conditions that led to the removal of the minor during any nine-month period following adjudication of neglect, specifically, the period between September 30, 2023, and June 30, 2024 (*id.* § 1(D)(m)(i)); and failure to make reasonable progress toward the return of the minor during the same nine-month period (*id.* § 1(D)(m)(ii)). The State further alleged that the identity of the minor's father was still unknown and that any and all unknown fathers were

3

unfit for abandoning the minor (*id.* § 1(D)(a)) and failing to demonstrate a reasonable degree of interest, concern, or responsibility for the minor's welfare (*id.* § 1(D)(b)).

¶ 9    In early September 2024, Lutheran Child and Family Services (LCFS), under the auspices of DCFS, filed a permanency report and a service plan in anticipation of a scheduled permanency hearing. The report stated that the identity of the minor's father was unknown and that the "mother [was] withholding this information." The service plan likewise indicated that "no father has been named or come forward." It also stated that Mother "now says the father has moved eight hours away and does not want anything to do with [the minor] but will not supply a name."

¶ 10    The matter came for a permanency hearing on September 11, 2024. The circuit court asked if the State had provided proof of service by publication on any and all unknown fathers. The State responded, "I don't think so." The circuit court directed the State to do so. Next, addressing Mother, the circuit court inquired, "And, ma'am, do you know who the father is?" Mother replied, "No."

¶ 11    On October 17, 2024, LCFS filed another report in anticipation of a status hearing the following week. LCFS again noted that Mother was withholding the name of the minor's father. At an October 23, 2024, status hearing, the circuit court noted that the file still did not reflect service by publication on any and all unknown fathers. The circuit court reminded the State, "Don't forget I'm going to need a diligent search in the file."

¶ 12    On October 25, 2024, the State filed a notice of publication and an affidavit for service by publication. The affidavit once again stated, "Each respondent named below cannot be found within this State, or has left this State and cannot be located, so that process cannot be served upon him either personally or by certified mail. The present address of each respondent named below cannot be ascertained upon diligent inquiry." The affidavit listed the respondents as "unknown

4

fathers" and listed their last known addresses as "unknown." On November 1, 2024, a certificate of the publisher was filed certifying that the requested notice was published in the Effingham Daily News on October 30, 2024. This time, the notice identified the minor by her full name.

¶ 13    On November 20, 2024, the matter proceeded to a hearing on the State's motion to terminate parental rights. The circuit court granted a motion for a continuance filed by Mother and went on to find any and all unknown fathers in default for failure to appear. On the same date, the circuit court entered a written order terminating the parental rights of any and all unknown fathers.

¶ 14    On February 12, 2025, the matter came for a rescheduled termination hearing for Mother. Mother appeared at the courthouse prior to the hearing, presented a signed final and irrevocable consent to adoption by specified persons, and then left. After hearing testimony from Mother's caseworker concerning the circumstances surrounding Mother's signing of the consent, the circuit court accepted Mother's surrender of her parental rights. On the same date, the circuit court entered a written order terminating Mother's parental rights.

¶ 15    On April 30, 2025, Father filed a motion to vacate the default judgment terminating parental rights, citing section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2024)). He alleged that (1) Mother initially advised him that DNA testing confirmed that another man was the father of the minor; (2) after surrendering her parental rights to the minor, Mother informed Father that he was, in fact, the minor's biological father; and (3) Father sought legal counsel to file his motion to vacate "[i]mmediately upon gaining this knowledge." Father argued that he had a meritorious defense in the underlying juvenile court proceedings because if found to be the biological father, he stood "ready, willing, and able to undertake full care, custody, and control of the minor." He further argued he "exercised full due diligence" in presenting his claim.

5

¶ 16    On May 28, 2025, the circuit court held a permanency hearing regarding the minor. As to Father's pending motion to vacate the default order, an order for DNA testing to determine paternity was agreed to by Father, and the State did not object. When asked how long it would take to get lab results, the LCFS representative estimated that results would be available in six to eight weeks. The circuit court set the matter for a July 23, 2025, hearing to allow time for the DNA results to be available.

¶ 17    Due to various delays, DNA testing did not occur for several months. The lab results, which were received on September 30, 2025, indicated a 99.99% probability that Father was the minor's biological father.

¶ 18    On December 10, 2025, the circuit court held a hearing on Father's motion to vacate the default order. Father testified that although he and Mother were not romantically involved, he slept with her "maybe" twice. When Mother became pregnant, Father asked if he was the father of her baby, but she told him that Mills was the father. Father testified that he "wasn't convinced," and he asked Mother to have a paternity test. After the baby was born, Mother informed Father that a paternity test confirmed that Mills was the father of her baby. Father testified that he believed Mother because he "could never see [her] lying about something involving a child like this." According to Father, he received text messages from a friend in March 2025 indicating that Mother lied about the father of her baby. The circuit court took the matter under advisement and allowed the parties to file written arguments.

¶ 19    Father filed a memorandum in support of his motion. He argued that service by publication was inadequate to establish personal jurisdiction over him because it was not supported by a diligent inquiry to identify and locate unknown fathers.

¶ 20    On February 4, 2026, the circuit court entered a written order denying Father's motion to vacate the default order. In addressing the question of the State's compliance with the requirement that it perform a diligent inquiry prior to service by publication, the circuit court relied heavily on the decision of *In re A.S.B.*, 293 Ill. App. 3d 836 (1997). The court noted that like this case, *In re A.S.B.* involved a biological father who alleged "he was duped about his parentage" when the mother claimed that a different man was the minor's father. The circuit court noted that several recent decisions addressing the diligent search requirement, such as *In re Dar. C.*, 2011 IL 111083, and *In re C.K.*, 2023 IL App (5th) 230012, were less relevant than *In re A.S.B.* because they dealt with the question of "what constitutes a 'diligent search' when the identity of the father is known." The circuit court then explained that in both this case and *In re A.S.B.*, "DNA testing was conducted on one possible putative father, and DCFS took active steps to develop more possible fathers through discussions with the mother." Although the circuit court found that the State erred in failing to provide a more detailed affidavit, it concluded that, as in *In re A.S.B.*, a "diligent search" was made.

¶ 21    The circuit court went on to find that, even assuming the State and DCFS failed to conduct a diligent inquiry, Father's motion to vacate the default order should still be denied because Father did not demonstrate that he had a meritorious defense or that he acted with due diligence in pursuing his claim or defense. This timely appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, Father argues that the circuit court lacked personal jurisdiction over him because there is no indication the State conducted a diligent inquiry to discover his identity prior to attempting to effectuate service by publication. As such, he contends, the default order terminating the parental rights of any and all unknown fathers was void *ab initio* and the circuit

7

court erred in denying his motion to vacate that order. We agree. Because this conclusion is dispositive, we need not address Father's remaining contentions.

¶ 24 The central issue in this case is whether the circuit court obtained personal jurisdiction over Father at the time it entered the default order terminating his parental rights. When a circuit court lacks personal jurisdiction over a party, it does not have the authority or power to impose any judgment against that party. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re M.W.*, 232 Ill. 2d 408, 428 (2009)). If a court lacks either subject matter or personal jurisdiction, its orders are void *ab initio* and may be challenged at any time. *Id.* (citing *In re M.W.*, 232 Ill. 2d at 414). Whether a circuit court obtained personal jurisdiction over a party is a question of law subject to *de novo* review. *Id.*

¶ 25 Personal jurisdiction over a party may be vested in a circuit court through the effective service of process, which provides interested parties with proper notice and an opportunity to be heard. *Id.* ¶ 61. "[I]nadequate service of summons or process divests the [circuit] court of personal jurisdiction." *Id.*

¶ 26 The Juvenile Court Act sets forth the procedures necessary to effectuate service of process on a respondent parent. *In re C.K.*, 2023 IL App (5th) 230012, ¶ 37 (citing 705 ILCS 405/2-15, 2-16 (West 2020)). Section 2-15 provides for personal service at least three days before the date of the hearing at issue. *Id.* (citing 705 ILCS 405/2-15 (West 2020)). If the State is unable to effectuate personal service on a respondent parent, the Juvenile Court Act provides two alternative options. *Id.* ¶ 38. The first is service by certified mail. *Id.* (citing 705 ILCS 405/2-16(1) (West 2020)). The second option, authorized "[a]s a last resort," is service by publication. *In re Dar. C.*, 2011 IL 111083, ¶ 64.

¶ 27 Service by publication is governed by section 2-16(2) of the Juvenile Court Act, which provides, in pertinent part, as follows:

"Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. *** If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, *** [the] petitioner's attorney shall file an affidavit *** showing that [the] respondent on due inquiry cannot be found or is concealing [the respondent's] whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service." 705 ILCS 405/2-16(2) (West 2022).

Section 2-16(2) expressly "contemplates a [circuit] court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address." (Emphasis in original.) *In re Dar. C.*, 2011 IL 111083, ¶ 64.

¶ 28 The statute "does not define what constitutes a diligent inquiry." *Id.* ¶ 65. However, our supreme court has held that the diligent inquiry requirement is satisfied by " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make.' " *Id.* (quoting *In re Sheltanya S.*, 309 Ill. App. 3d 941, 956 (1999), citing *In re A.S.B.*, 293 Ill. App. 3d at 842)). The court explained that a diligent inquiry "necessarily requires a good-faith attempt at acquiring the contact information of a parent whose whereabouts [and/or identity] are unknown." *Id.* ¶ 81.

¶ 29 This court's recent decision in *In re C.K.* offers valuable guidance in determining what sort of search is adequate to satisfy this requirement. There, we observed that section 2-16(2) of the

Juvenile Court Act required DCFS to " 'adopt rules defining the requirements for conducting a diligent search.' " *In re C.K.*, 2023 IL App (5th) 230012, ¶ 42 (quoting 705 ILCS 405/2-16(2) (West 2020)). We noted that to satisfy this requirement, DCFS adopted a procedural manual detailing the steps its workers must undertake to conduct the diligent search necessary for service by publication in proceedings involving termination of parental rights. *Id.* (citing Ill. Dep't of Child. & Fam. Services, Administrative Procedure No. 22, Diligent Search (adopted June 1, 2003), https://dcfs.illinois.gov/content/dam/soi/en/web/dcfs/documents/about-us/policy-rules-and-forms/documents/administrative-procedure/administrative-procedure-22.pdf [https:perma.cc/96CL-VSPK] (Administrative Procedure No. 22).

¶ 30    We then set forth the steps included in that manual. *Id.* While some of the steps are not possible unless and until a parent's identity is known, other steps are explicitly applicable when a parent's identity is unknown. For example, one step mandated in the DCFS manual is to review the complete agency file to find any information it might contain " 'regarding the identity of a parent whose identity is currently unknown' " and/or " 'information regarding relatives who may be able to assist [in the] search.' " *Id.* (quoting Administrative Procedure No. 22 § 22.4(d)(1)). In addition, the guidelines in the manual require DCFS to " '[a]sk any available parent and relatives about names and addresses of the missing parent' " and to discover as much information as possible from " 'any relatives' " DCFS can find, including those with whom it already has contact. *Id.* (quoting Administrative Procedure No. 22 § 22.4(d)(3)). Finally, the DCFS diligent search guidelines require a review of the complete court file to find any information contained therein " 'regarding the identity or address of a parent that is currently unknown' " or any " 'information regarding attorneys who represent parents, or relatives who may be able to assist [in the] search.' " *Id.* (quoting Administrative Procedure No. 22 § 22.4(d)(5)).

10

¶ 31 After quoting at length from these guidelines, this court explained, "What is apparent from the steps outlined by DCFS is the care and thoroughness required when the State is seeking to terminate parental rights. This level of thoroughness is appropriate because terminating a parent's rights to his child impacts a fundamental liberty interest." *Id.* ¶ 43.

¶ 32 In the instant case, the record contains no evidence of the necessary level of care and thoroughness to terminate Father's parental rights. The permanency reports and service plans on file indicate that Mother refused to provide the names of any possible fathers and, at one point, falsely stated that the minor's father moved away and refused to have anything to do with the minor. This implies that at some point, Mother was asked about the identity of any possible fathers. While this was an appropriate step to take, there is no indication in the record that any additional steps were taken. There is nothing in the record indicating that the State, DCFS, or LCFS reviewed the agency or court files for further information that might be helpful, as required under the DCFS guidelines we have just discussed. There is likewise no indication that anyone searched the Putative Father Registry, a potential source of information about individuals claiming to be the minor's father.

¶ 33 Significantly, DCFS and LCFS had contact with both of Mother's parents. Her father and his girlfriend were the foster parents of two of Mother's children, including the minor at issue in this case, and her mother was the foster parent of one of Mother's other children. Yet there is no evidence that the State asked either of Mother's parents if they knew of any possible fathers. As our supreme court explained, a diligent inquiry "necessarily requires a good-faith attempt at acquiring the contact information of a parent whose whereabouts [and/or identity] are unknown." *In re Dar. C.*, 2011 IL 111083, ¶ 81. This requires the State and DCFS to follow any potential leads that exist based on the information they already have. *Id.* This court has observed that "a

11

parent's relatives are a primary source of information about a parent's whereabouts." *In re C.K.*, 2023 IL App (5th) 230012, ¶ 48. Here, the contact was with Mother's parents, not the parents of the missing respondent, but they were still at least a potential source of information that might have led to identifying the minor's biological father. In light of all we have said about the requirement of following any possible leads and engaging in a thorough and careful search, we cannot find that merely asking Mother to identify possible fathers constitutes a diligent search.

¶ 34  We recognize that the circuit court relied upon a case that reached the opposite conclusion, *In re A.S.B.* There, DCFS and the State had difficulty locating the minor's mother and had to serve her with notice of the proceedings by publication. *In re A.S.B.*, 293 Ill. App. 3d at 839. After a blood test revealed that the first man identified as a putative father was not the biological father, the circuit court ordered DCFS to attempt to locate the mother. *Id.* DCFS filed an affidavit of diligent search describing its efforts to locate the mother and asserting that because she could not be found, it would not be possible to ask about the identity of the minor's father. *Id.* The State served all unknown fathers by publication and eventually terminated their parental rights by default. *Id.* at 839-40.

¶ 35  After the mother surrendered her parental rights, a DCFS report filed with the circuit court indicated that the mother had identified a second man as the minor's father. *Id.* at 840. By this time, a petition for adoption was already pending. *Id.* The second putative father sought to intervene in the adoption proceedings. *Id.* However, the circuit court granted DCFS's motion to strike his petition to intervene and finalized the adoption without notice to the putative father.[1] *Id.*

---

[1]Although the putative father appeared in court during the adoption proceedings, he did not file a petition to intervene until shortly after the adoption was finalized. *In re A.S.B.*, 293 Ill. App. 3d at 840.

¶ 36    On appeal, the second putative father argued that his due process rights were violated because DCFS failed to exercise due diligence in attempting to identify and locate unknown fathers. *Id.* at 841. In rejecting this claim, the *In re A.S.B.* court emphasized that DCFS "made several attempts to locate [the mother] to determine the identity of [the minor's] father." *Id.* at 842. The Second District found that this was the type of inquiry "a diligent person, intent on ascertaining a fact, would usually and ordinarily make." (Internal quotation marks omitted.) *Id.* The court thus concluded that DCFS engaged in the requisite diligent inquiry before requesting service by publication on unknown fathers. *Id.*

¶ 37    We note that in *In re. A.S.B.*, DCFS was obviously required to engage in more extensive efforts to ask the mother about the identity of the father than were necessary in this case. In addition, the record in *In re A.S.B.* indicated that the Putative Father Registry was checked at some point, although it is not clear when this occurred. *Id.* at 840. Nevertheless, to the extent *In re A.S.B.* holds that asking a mother to identify possible fathers is sufficient to constitute a diligent inquiry in every case, it is at odds with our analysis in *In re C.K.*, and we decline to follow it. See *Barrall v. Board of Trustees of John A. Logan Community College*, 2019 IL App (5th) 180284, ¶ 27 (stating that this court is not obliged to follow the holdings of other districts of the Illinois Appellate Court).

¶ 38    For these reasons, we find that the State failed to engage in the type of diligent inquiry necessary for service by publication. We therefore conclude that the circuit court lacked personal jurisdiction over Father when it entered a default order terminating the parental rights of any and all unknown fathers. The circuit court erred in reaching the opposite conclusion.

¶ 39    The circuit court went on to find that, even assuming it lacked personal jurisdiction over Father when it entered the default order terminating parental rights, his motion to vacate should be

13

denied because Father failed to establish either that he had a meritorious defense or that he exercised due diligence in presenting his claim or defense. This was error.

¶ 40   A motion to vacate a void judgment or order may be brought under section 2-1401 of the Code, the provision cited by Father in his motion. *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 104 (2002). Generally, petitions pursuant to section 2-1401 must allege the existence of a meritorious claim or defense and due diligence in presenting that claim. *Id.* at 103. However, these requirements are not applicable when a section 2-1401 petition challenges a void order. *Id.* at 104; see 735 ILCS 5/2-1401(f) (West 2024). In such cases, "the allegation that the judgment or order is void substitutes for and negates the need to allege a meritorious defense and due diligence." *Sarkissian*, 201 Ill. 2d at 104.

¶ 41   Here, Father's petition alleged that he had a meritorious defense and exercised due diligence in bringing it. However, he argued to the circuit court both that he satisfied these requirements and that the circuit court lacked personal jurisdiction over him, thereby rendering the order void. Because the order was void, Father was not required to demonstrate the existence of a meritorious defense or due diligence in pursuing that defense to succeed on his motion to vacate. The circuit court erred in finding that a failure to satisfy these requirements was a proper basis upon which to deny Father relief.

¶ 42                                III. CONCLUSION

¶ 43   For the foregoing reasons, we reverse the circuit court's order denying Father's motion to vacate the default order terminating his parental rights and remand for further proceedings consistent with this decision.


¶ 44   Reversed and remanded.

14

*In re Alice D.*, 2026 IL App (5th) 260117

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Effingham County, No. 23-JA-1; the Hon. Bryan M. Kibler, Judge, presiding. |
| **Attorneys for Appellant:** | Frances E. Salimi, of Marion, for appellant. |
| **Attorneys for Appellee:** | Aaron Jones, State's Attorney, of Effingham (Patrick Delfino, Patrick D. Daly, and Valerie Ozment O'Brien, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |