NOTICE
Decision filed 05/02/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230492-U

NO. 5-23-0492

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* CHASITY J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Shelby County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-28 |
| | ) | |
| Cory J., | ) | Honorable |
| | ) | Amanda S. Ade-Harlow, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the grounds for unfitness alleged in the State's termination petition did not implicate adjudicatory and dispositional matters, the trial court had personal jurisdiction to proceed with the State's petition; the trial court's finding that respondent was an unfit person was not contrary to the manifest weight of the evidence; the trial court's conclusion that the minor's best interest would best be served by termination of respondent's parental rights was not contrary to the manifest weight of the evidence.

¶ 2    Cory J. (Cory) is the father of a girl, Chasity J. (C.J.). The Department of Children and Family Services (DCFS) initiated court proceedings in this case in 2019. The State served Cory by publication. Cory was defaulted at the adjudicatory and dispositional hearings. After the court filed its petition to terminate his parental rights in 2023, an attorney was appointed to represent him. This attorney filed a petition to dismiss the State's motion on the basis that the trial court

1

lacked personal jurisdiction over Cory. Cory made his first court appearance in this case on May 1, 2023, by Zoom. Although the trial court denied Cory's motion to dismiss, Cory continued to object at the fitness hearing on the basis of jurisdiction. The trial court found that Cory was an unfit parent, and then concluded that it was in C.J.'s best interest to terminate his parental rights. He appeals from these orders.[1]

¶ 3                                    I. BACKGROUND

¶ 4        C.J. was born on June 2, 2013. C.J.'s mother is Elizabeth P. (Elizabeth).[2] When this case began, C.J. lived with Elizabeth in Windsor. Elizabeth's boyfriend and their son lived in the same household. DCFS originally opened a case regarding C.J. on October 5, 2018, after C.J. told another student at school that her "dad Lee" (Elizabeth's boyfriend) knocked her head into a wall, after which she did not move for a while. When questioned, C.J. was unable to say when this incident occurred. A visit to the home, however, revealed that the home was infested with cockroaches and fleas. C.J. was placed in foster care, but at a previous adjudicatory hearing on December 17, 2018, C.J. was returned to Elizabeth's care. Elizabeth continued to work with DCFS and made progress until May 2019. At that time, Elizabeth and her boyfriend began having the same environmental house problems that had previously resulted in the removal of C.J. and her younger brother from the home.

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311(a)(5) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the 150-day period expired on December 4, 2023. This court entered two rule to show cause orders on September 12, 2023, and December 6, 2023, because the appellant, Cory J., had not yet filed his brief. Cory J. then requested two briefing extensions on December 13, 2023, and December 20, 2023. The requests were granted, and the briefing schedule was extended to January 19, 2024. The case was placed on the next available docket, which was February 20, 2024. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

[2]Elizabeth surrendered her parental rights on May 4, 2023, and is not a party to this appeal.

¶ 5    In 2019, DCFS initiated this case, and the State filed its petition for adjudication of wardship on September 20, 2019, stating:

> "That between the dates of May 1, 2019, and August 26, 2019, the Minor was neglected, in that the Minor is living in an environment that is injurious to her health and welfare, in that the home had two short kitchen knives and an ashtray overflowing with cigarette butts on the coffee table and medication bottles laying on the couch; further, the parents have not been participating in parenting/habilitation services since May, 2019, pursuant to 705 ILCS 405/2-3(1)(b)."

The State alleged that C.J. was abused and neglected and that it was in her best interest to be adjudged a ward of the court. In its petition for adjudication of wardship, the State listed Cory as C.J.'s father with a last known address as "West Virginia (Believed to be in prison)."

¶ 6    Just 11 days after the State filed its petition for adjudication, the State filed its notice of publication directed to Cory. The October 1, 2019, notice stated that the hearing on the State's petition for adjudication would be held on October 28, 2019. The Shelby County circuit clerk forwarded the notice of publication to the Shelbyville Daily Union. The notice of publication was printed in the newspaper on October 8, 2019.

¶ 7    The adjudicatory hearing did not take place on October 28, 2019, but was rescheduled until November 27, 2019. On that date, Elizabeth stipulated to the allegations of the petition. Cory did not appear for the hearing, and the trial court found him to be in default. The court then entered its order continuing the adjudicatory hearing under supervision until November 26, 2020. 705 ILCS 405/2-20 (West 2018). The court found that it was in C.J.'s best interest to keep her in her mother's home and found that a supervision order was more appropriate than an adjudicatory order after Elizabeth stipulated to the adjudicatory petition allegations. *Id.* § 2-20(1). The court ordered

3

Elizabeth to cooperate with DCFS, to engage in and complete counseling as DCFS directed, to participate in parenting/habitation services, to make efforts to clean up the residence, and to maintain supervision over C.J.

¶ 8     DCFS filed a report with the court on February 27, 2020, indicating that it had not contacted Cory. DCFS noted ongoing issues with Elizabeth and her boyfriend—now Elizabeth's husband. C.J. had not been engaged in consistent counseling. The family had not engaged in individual therapy and had cancelled seven parenting classes. The environmental condition of the house remained a concern. C.J. had not seen her primary care physician despite a condition of chronic headlice and had been discharged from psychiatric treatment[3] for repeatedly missing scheduled appointments.

¶ 9     On March 13, 2020, the State filed its petition to revoke the continuance of the adjudicatory hearing under supervision, alleging that continuing the adjudicatory hearing was no longer consistent with C.J.'s health, safety, and best interest. On May 21, 2020, the trial court held the adjudicatory hearing. Cory was not named in this adjudicatory order, having been previously defaulted. At the conclusion of the hearing, the court found that C.J. was abused or neglected because she was living in an environment that was injurious to her welfare (*id.* § 2-3(1)(b)).

¶ 10     On June 11, 2020, DCFS filed its dispositional hearing report. DCFS indicated that it had not had contact with Cory since the inception of the case, stating that "[a]ttempts have been made without any success." DCFS did not provide any additional details about unsuccessful contact attempts. DCFS recommended that the trial court find that Cory was unable and unwilling to care for, protect, train, educate, supervise, or discipline C.J. and that placement with him would be contrary to C.J.'s health, safety, and best interest. DCFS's foundation for this recommendation

---

[3]The record contains no information regarding the reasons the minor was receiving psychiatric care.

4

was that Cory had not engaged with DCFS about C.J., nor had he reached out to Elizabeth about C.J. DCFS concluded by asking the court to make C.J. a ward of the court, and to grant DCFS custody and guardianship.

¶ 11    On July 9, 2020, the trial court entered its dispositional order. Cory was not listed as a party in this order. However, Larry "Lee" K. was listed as the father of C.J.'s younger brother, S.K. The trial court concluded that it was consistent with C.J.'s health, welfare, safety, and best interest to be made a ward of the court. The trial court granted the dispositional petition, adjudicated C.J. as neglected, and made her a ward of the court. Custody and guardianship of C.J. was placed with DCFS.

¶ 12    The case continued without any interaction with Cory. On January 13, 2023, DCFS filed its report in preparation for the January 18, 2023, permanency hearing. At that time, C.J. was nine years old and had been living in a fictive kin foster home since December 29, 2021.

¶ 13    On February 7, 2023. The State filed its motion asking the court to find Cory an unfit parent and to terminate his parental rights. Cory was listed as living in Left Hand, West Virginia, at a residential address. The State alleged that Cory was an unfit parent for the following five reasons: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility for C.J.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) he failed to make reasonable efforts to correct the condition that were the basis for C.J.'s removal during any nine-month period following C.J.'s adjudication, specifically from May 7, 2022, through February 7, 2023 (*id.* § 1(D)(m)(i)); (3) he failed to make reasonable progress toward C.J.'s return during any nine-month period following her adjudication, specifically from May 7, 2022, through February 7, 2023 (*id.* § 1(D)(m)(ii)); (4) he abandoned C.J. (*id.* § 1(D)(a)); and (5) he deserted C.J. (*id.* § 1(D)(c)).

5

¶ 14    On March 16, 2023, an attorney was appointed for Cory, and she entered her appearance on his behalf. On April 17, 2023, she filed a motion to dismiss the State's termination petition. She alleged that the State failed to serve Cory before holding the adjudicatory hearing and Cory never received a copy of that petition or any other pleadings in this case. She further argued that the State must conduct a diligent inquiry if the respondent's usual place of abode is not known, and if the address or abode cannot be determined, the attorney representing the State "shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found," and thus service could not be achieved. As no such affidavit was filed in this case, she argued that the notice of publication filed shortly after the case was initiated, and the resulting service by publication, were ineffective, and thus depriving the trial court of jurisdiction over Cory.

¶ 15    The trial court held a hearing on Cory's motion to dismiss on May 1, 2023, at which Cory made his first court appearance in this case by Zoom. Cory's attorney argued that the State failed to serve Cory, and because he had been in contact with DCFS before the case commenced, his contact information was known and available to DCFS. The State sought to call Cory as a witness to establish his whereabouts throughout the pendency of this case. The trial court denied the State's request because the motion to dismiss was inconsistent with an evidentiary hearing. The State argued that there was no requirement pursuant to the Juvenile Court Act and/or the Adoption Act requiring an underlying petition before the State files a motion to terminate a parent's rights. The State argued that it did not need to file petitions for adjudicatory and dispositional orders and before initiating the case against Cory by filing the petition to terminate. The trial court denied Cory's motion to dismiss. The court focused on the claim that the State did not have jurisdiction over Cory to terminate his parental rights and stated: "[t]he motion [to terminate] would not be

6

allowed *** when [the motion] is attacking a situation *** under the adjudication and disposition of wardship." The court noted that whether "the court allows evidence as it relates to adjudication and disposition is another story."

¶ 16    The trial court held the fitness hearing on May 4, 2023, and May 5, 2023. At the beginning of the hearing, Elizabeth executed a final and irrevocable surrender for purposes of adoption. The State then called her to testify. Elizabeth confirmed that Cory was C.J.'s father. At the time she gave birth to C.J., she lived in West Virginia. She moved to Illinois in 2016 and did not bring C.J. back with her. She and Cory had worked out a custodial arrangement where each parent would care for C.J. for alternating three-month periods. In May 2017, Elizabeth brought C.J. to Illinois on a full-time basis. She testified that she last had contact with Cory through Facebook before he went to prison in 2018. She stated that Cory spoke with C.J. through Facebook and by phone, until Elizabeth changed her phone number. She testified that she was in daily contact with Cory's girlfriend through Facebook. In 2021, when he was released from prison, Cory contacted Elizabeth through his father's Facebook page. By the time that Cory was released from prison, C.J. was in foster care. Elizabeth testified that she informed every DCFS person with whom she had contact about Cory's arrest and imprisonment. She stated that Cory contacted her caseworker, "Michelle Ross," before he went to prison. Elizabeth testified that Cory did not send anything to her for C.J.'s benefit while he was incarcerated.

¶ 17    On cross-examination by Cory's attorney, Elizabeth acknowledged that for some time after she and C.J. moved to Illinois, C.J. returned to West Virginia and was in Cory's care. When Cory went to prison, Elizabeth went to West Virginia to bring C.J. back to Illinois. Until DCFS removed C.J. from Elizabeth's care, she kept her "Facebook open to [Cory] to have contact with her ***."

7

She testified that she did not change her phone number to keep Cory from contacting C.J. and stated that if Cory had asked for the new number, she would have given it to him.

¶ 18    Cory also testified at the fitness hearing and confirmed that he is C.J.'s father. He testified that he was currently on supervised release from prison after pleading guilty and then serving a sentence for soliciting a minor by computer. The female minor was 17 years old at the time of the solicitation and was one of Elizabeth's "best friends." The solicitation occurred at a time when he and Elizabeth were no longer a couple and he testified that the activity was "something stupid" that he regretted. He is currently on the National Sex Offender Registry. Cory testified that his intention in this case is to "be there" for C.J., "take care of her," and "give her a home." He stated that he wanted to be C.J.'s custodial parent. He lived in his father's West Virginia home with his father, his girlfriend, and his father's girlfriend. Cory was not employed and received disability benefits due to a heart condition.

¶ 19    Cory confirmed that in March 2023, he called the Shelby County State's Attorney's office to find out if he could appear in court on this case by Zoom. He learned about this court case when his girlfriend saw a post made by Elizabeth on Facebook that included a photograph of the State's petition to terminate, which included his name. Cory first contacted Elizabeth to get the name and contact information of the DCFS caseworker and she refused to provide the information. Thereafter, he contacted the Shelby County State's Attorney's Office, and that office provided Cory with the DCFS contact information. He contacted DCFS, and eventually spoke with a caseworker.

¶ 20    Between June 2020 and March 2023, Cory confirmed that he made no direct contact with C.J. because at that time he was precluded from doing so because he had not yet completed a set

amount of his probationary period. His probation officer had indicated that eventually he would be able to seek permission to interact with C.J.

¶ 21    Cory testified that during his incarceration he did not receive any communication from DCFS about this case. He also stated that Elizabeth never informed his girlfriend that DCFS was involved with C.J. However, Elizabeth provided Cory's girlfriend with updates on C.J.

¶ 22    Elizabeth moved back to Illinois in August 2017 and left C.J. with Cory. On Christmas Eve, 2017, Elizabeth contacted him to come pick up C.J. At that time, Cory was in contact with the DCFS caseworker assigned to Elizabeth and C.J.—Michelle Ross. He called Michelle Ross to ask if DCFS would allow him to retrieve C.J. and move her back to West Virginia. He was given permission to do so, and C.J. remained in his care until he went to prison in 2018. In December 2017, the West Virginia equivalent to Illinois's DCFS made a home visit to Cory's West Virginia residence and determined that everything was sufficient for C.J. About one week after Cory began serving his sentence, he received word from his family that Elizabeth had retrieved C.J. and returned to Illinois with her. Cory disputed Elizabeth's statement that she had his permission to take their daughter back to Illinois.

¶ 23    Cory testified that there were three cases filed in West Virginia involving him, Elizabeth, and/or C.J. The first was a domestic violence petition that was ultimately dismissed. The second established a visitation schedule for C.J. and her parents. The third case involved child support for C.J. In addition, Cory's father had opened a guardianship case in West Virginia regarding C.J. The purpose of the guardianship case was to establish stability in one household for C.J. because Elizabeth tended to move from place to place.

9

¶ 24    C.J. lived with Cory and his father for the first five years of her life. Although he only had his social security benefits, he and his family financially provided for C.J. He testified that he believed that it would be in C.J.'s best interest to be in his care.

¶ 25    On cross-examination, Cory acknowledged that he last spoke with C.J. by phone in 2019 while he was in prison. Upon release from prison, due to the nature of his conviction, he was not allowed to use the internet. His girlfriend remained in contact with Elizabeth through Facebook. Elizabeth would not provide Cory with her telephone number or otherwise give him "the time of day." Cory testified that after Elizabeth took C.J. back to Illinois in 2017, his family contacted DCFS caseworker, Michelle Ross, to inform her that Elizabeth had C.J.

¶ 26    Cory's current probation officer granted him permission to engage in the Illinois court proceedings. She also advised Cory that he could seek reconsideration from the criminal court judge about the possibility of having contact again with C.J. As of the date of the fitness hearing, he was still not authorized to have contact with her, until he completed his post-incarceration treatment. At the conclusion of Cory's testimony, a DCFS worker, Melissa Sanborn, clarified to the court that the original caseworker with whom Cory spoke was Michelle Ross, but later, the caseworker was Michelle Whitley.

¶ 27    The State next called Melissa Sanborn, DCFS caseworker and eventual supervisor of C.J.'s case. She testified that she had been involved with C.J. since 2018. In the 2018 case, C.J. was removed from Elizabeth's house for two months. At the adjudicatory hearing, the trial court found that there was a lack of sufficient evidence and the court returned C.J. to Elizabeth. Sanborn explained that Elizabeth and her then boyfriend opted to continue working with DCFS and the services offered. Ultimately, they failed to cooperate, which led to the opening of this 2019 new case. Elizabeth subsequently stipulated to the allegations contained within the petition for

adjudication of wardship in the 2019 case, and the trial court entered a continuance under supervision order for one year. See 705 ILCS 405/2-20 (West 2022).

¶ 28 The present case began in 2019, and the court supervision was revoked during this case. In the 2018 case, Sanborn testified that she spoke with Cory's father and "made attempts to contact [Cory] in prison." In 2020, after C.J. was removed from Elizabeth's care, Sanborn testified that she "completed [a] diligent search and mailed letters to addresses that were obtained." She indicated that one letter was sent to Stevens Correctional Center and a second letter was mailed to an address in Louisiana. Sanborn confirmed that she did not mail these letters to Cory's last known West Virginia residential address. In addition, she confirmed that "[t]he prison never responded" to her 2018 letters. Sanborn confirmed that Elizabeth did not provide addresses but had informed her that Cory was incarcerated. Sanborn testified that she had become aware from the case file that Cory had been in contact with DCFS in 2017. She also confirmed that Cory was not the "reason for removal" of C.J. in the 2017-2018 case or the 2019 case. On cross-examination, Sanborn indicated that she telephoned the West Virginia prison in 2018 and conducted a "diligent search" in May 2020.

¶ 29 At the conclusion of the fitness hearing, the trial court entered its written order on May 23, 2023. The court noted that the State only proceeded on three of the five claims that Cory was an unfit parent—(1) failure to maintain a reasonable degree of interest, concern, or responsibility as to C.J.'s welfare (705 ILCS 50/1(D)(b) (West 2022)); (2) that Cory had abandoned C.J. (*id.* § 1(D)(a)); and (3) that Cory had deserted C.J. (*id.* § 1(D)(c)). There was no question that Cory had not had communication with C.J. since he was released from prison in 2020. The court noted discrepancies in Cory's testimony about when he could have sought court modification of the prohibition from communicating with C.J. because his conviction involved solicitation of a minor.

11

Cory testified that he received slightly varying information from different probation officers. However, he believed that somehow the criminal court had the ability to allow him to have contact with C.J. The court noted that Cory was released from prison in mid-2020 yet took no action until March 2023. The court also took issue with Cory's lack of financial support of C.J. The trial court concluded that the State had established all three grounds supporting its allegations that Cory was an unfit person.

¶ 30    On July 5, 2023, the trial court held the best-interest hearing. Cory appeared by Zoom. The State called one witness and Cory testified on his own behalf. Jenna Krause, a DCFS caseworker who prepared the best-interest hearing report, testified for the State. Krause had not engaged in any investigation or communication with Cory's probation officer to determine what would be needed if C.J. was allowed to return to his care in West Virginia. Krause testified that she visits C.J. monthly. C.J. has lived with her foster parents since May 26, 2022, and was bonded with them. C.J. told Krause that she feels safe and loved by her foster parents and that she wants them to adopt her. Krause testified that C.J. had just completed the fourth grade and had mostly As on her final report card. C.J. has been diagnosed with attention deficit hyperactivity disorder for which she has been prescribed medication. Krause stated that Cory had not been in contact with DCFS since the fitness hearing.

¶ 31    On cross-examination, Krause confirmed that DCFS had taken no steps to contact Cory, and that she had not contacted his probation officer. Krause also testified that she did not believe that Cory had contacted C.J. since she was placed with these foster parents in May 2022. In addition, C.J. has ongoing visits with her siblings who are placed in other foster homes, and Krause testified that the foster parents have indicated that those visits would continue after adoption.

¶ 32    Cory testified that he continued to reside in West Virginia with his girlfriend, his father, and his father's girlfriend. He testified that C.J. was born in 2013 and lived with him in West Virginia until he went to prison in 2018. Upon his discharge from prison, his parole officer told him that he could have no contact with C.J. or any other child due to the nature of his crime. Cory testified that he learned that C.J. was in DCFS custody in early 2019. He had been allowed to speak with C.J. by phone from prison and he had a couple of conversations with her, but then Elizabeth stopped taking his calls. Cory's father then learned and informed Cory that C.J. had been removed from Elizabeth's home. Because he was incarcerated, Cory explained that there was nothing he could do about C.J.'s status. After he was released from prison, Cory served a year of parole, and he was not allowed to have contact with C.J. After his year of parole, he was transferred into a probationary program in August 2021, and he was engaged in classes. At the time he testified, he had six more months of classes after which Cory would be released from any supervised watch program in West Virginia.

¶ 33    Cory testified that during the years that C.J. lived with him, they did everything together and he was very close with her. Similarly, C.J. had a close relationship with Cory's father. Cory testified that he would be devastated if his parental rights were terminated, but acknowledged that he wanted what was best for C.J. He testified that he felt the process in this case was unfair because he had not been allowed an opportunity to "prove myself as a parent." He testified that in 2015, his father attempted to gain guardianship of C.J. because Elizabeth kept going "all over the place" with her, and at that time, Cory did not have a stable housing situation. Initially, the trial court granted the guardianship request, but after Elizabeth addressed the court, it reconsidered. One week after this guardianship hearing, Elizabeth returned with C.J. to resume living with Cory.

13

¶ 34    At the conclusion of the testimony and arguments by counsel, the trial court considered the statutory best-interest factors. The court entered its order finding that C.J. had previously been made a ward of the court after being adjudicated as neglected, and that DCFS was appointed C.J.'s guardian and custodian after the July 10, 2020, dispositional hearing. Noting the order finding that Cory was an unfit person, and after consideration of the statutory factors, the trial court concluded that it was in the best interest of C.J. to terminate Cory's parental rights.

¶ 35                                    II. ANALYSIS

¶ 36                              A. Personal Jurisdiction

¶ 37    On appeal, Cory first contends that the trial court did not have personal jurisdiction over him because he was never served with process. Although the trial court authorized service of Cory by publication, we agree that the timing of this publication and the lack of any affidavit filed on behalf of the State or DCFS make the publication decision at that time potentially improper.

¶ 38    Termination of a parent's rights involves a fundamental liberty interest. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re M.H.*, 196 Ill. 2d 356, 363 (2001)). Whether a trial court obtained personal jurisdiction is a legal question reviewed on a *de novo* basis. *Id.* (citing *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010)). If the court lacks personal jurisdiction over a party, "any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d 408, 414 (2009).

¶ 39    The Juvenile Court Act of 1987 (Act) provides the service of process procedure for a parent. See 705 ILCS 405/2-15, 2-16 (West 2018). After a petition is filed, the trial court is required to issue a summons with a copy of the petition attached. *Id.* § 2-15(1). This summons must be served "by any county sheriff, coroner or probation officer" by leaving a copy with the person named in the summons, or by leaving a copy at his or her usual place of abode with a family

14

member or with any person who lives at the address and is over the age of 10, and then mailing a copy to the person named in the summons. *Id.* § 2-15(4), (5). The statute mandates that personal service must be made at least three days before the scheduled hearing. *Id.* § 2-15(5).

¶ 40    The Act provides two alternatives if personal service cannot be obtained—service by certified mail if personal service was not made "within a reasonable time or if it appears that any respondent resides outside the State" (*id.* § 2-16(1)), or service by publication (*id.* § 2-16(2)).

¶ 41    Section 2-16(2) of the Act "contemplates a trial court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address." (Emphasis in original.) *In re Dar. C.*, 2011 IL 111083, ¶ 64.

¶ 42    Our legislature did not define the term "diligent inquiry." *Id.* ¶ 65. The Illinois Supreme Court in *In re Dar. C.* quoted caselaw and a dictionary in stating that the standard for a diligent inquiry was " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make' " (*id.* (quoting *In re Sheltanya S.*, 309 Ill. App. 3d 941, 956 (1999))) and " 'characterized by steady, earnest, attentive, and energetic application and effort in a pursuit' " (*id.* (quoting Webster's Third New International Dictionary 633 (1993))). The court concluded in *In re Dar. C.* that the State failed to make a diligent inquiry by merely entering the respondent's name into various computer databases and then mailing letters to addresses located in the databases, and thus, service by publication was inappropriate. As discussed recently by this court in *In re C.K.*, 2023 IL App (5th) 230012, ¶ 42, DCFS has adopted a procedural manual on the topic of diligent searches: "Administrative Procedure #22, Diligent Search."[4]

_____

[4]Section 22.4(d) of this manual provides specific directions for this diligent search if service by publication is ultimately necessary. *Id.* See https://dcfs.illinois.gov/content/dam/soi/en/web/dcfs/documen ts/about-us/policy-rules-and-forms/documents/administrative-procedure/.administrative-procedure-22.pdf (June 1, 2003) [https://perma.cc/96CL-VSPK].

¶ 43    Here, there is no question that DCFS did not comply with the statutory requirement and its own procedures before serving Cory by publication. In September 2019 when this case was initiated, DCFS listed Cory as the father, listed his state of residence as West Virginia, and indicated that it believed he was incarcerated in a West Virginia prison. In the earlier 2018 case, to which Cory was not listed as a party to the DCFS proceedings, DCFS was aware that Cory was incarcerated and DCFS supervisor Sanborn testified that in 2018 she "sent a letter" to the specific prison, but the "prison" never responded to her letter. DCFS did not follow its own procedures, and thus, we find that the State's attempted service of Cory by publication was improper.

¶ 44    The State argues that despite the improper service by publication, the trial court's order was legally appropriate because of the nature of the three grounds for unfitness—(1) failing to maintain a reasonable degree of interest, concern, or responsibility as to his child; (2) abandonment; and (3) desertion. These three grounds had nothing to do with Cory's failure to comply with services or failure to correct any of the conditions that initially brought C.J. into care.

¶ 45    The State cites to *In re T.A.*, 359 Ill. App. 3d 953 (2005), in support of the trial court's finding that Cory was an unfit person. In that case, the father never received notice of the State's petition for adjudication of wardship. *Id.* at 955. Ultimately, the trial court proceeded with the adjudicatory and dispositional hearings and entered orders. *Id.* at 955-56. Then, more than a year later, the State filed its petition to terminate the parent's rights alleging that he was an unfit parent on three grounds: (1) failure to make reasonable progress toward the return of his child; (2) failure to make reasonable efforts to correct the conditions that were the basis for T.A.'s removal; and (3) failure to maintain a reasonable degree of interest, concern, or responsibility as to T.A.'s welfare. *Id.* at 956. The trial court found that the father was unfit on the third ground advanced by

16

the State—that he failed to maintain a reasonable degree of interest, concern, or responsibility as to T.A.'s welfare. *Id.* at 957.

¶ 46    On appeal, the father claimed that the trial court lacked jurisdiction in the neglect proceedings because the State did not make him a party to the case. *Id.* The appellate court found that because the unfitness finding was "*not* based on an assessment of the parent's compliance with the dispositional order in the neglect proceedings ***, the termination proceeding stands on its own." (Emphasis in original.) *Id.* at 958. The court continued by stating that "a flaw in the preceding neglect proceedings—even a flaw that renders void an order entered therein—has no bearing on the subsequent termination case." *Id.* The appellate court explicitly distinguished the case from any situation where the parent was not properly served at the beginning of the case and was found unfit for failing to comply with directives the parent received in the neglect portion of the case. A parent's "participation in those proceedings might be viewed as essential to a fair determination of whether he has made reasonable efforts to correct the conditions that led to his child's removal [citation] or reasonable progress toward the child's return within a given time period [citation]." *Id.*

¶ 47    In this case, there is no question that the defendant was not properly served. The State initially alleged that Cory was an unfit person on the basis that he failed to progress in his service plan objectives and failed to make reasonable efforts to correct the conditions that led to C.J.'s removal from the home. However, the State opted not to proceed with either of these grounds at the fitness hearing. Further, though counsel, and at the fitness hearing, Cory appeared in this case. Thus, the flaw in jurisdiction that would have rendered the adjudicatory and dispositional orders void has no bearing on the termination case because the grounds for unfitness presented at the

17

hearing were not connected to any admonishments and/or guidance he may have received earlier in this neglect case. *Id.*

¶ 48                                   B. Subject Matter Jurisdiction

¶ 49    Alternatively, Cory argues that the trial court also lacked subject matter jurisdiction over the proceedings in this case pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 *et seq.* (West 2022)). During the fitness hearing, Cory testified that there were guardianship and child support cases pending in West Virginia, with his father filing guardianship paperwork possibly in 2015. He also argued that the "home state" for UCCJEA cases related to this child was West Virginia because C.J. originally lived in West Virginia. However, he provides neither legal argument nor caselaw or statutory authority in support of this argument, which, accordingly, we find has no merit.

¶ 50                                   C. Termination of Parental Rights

¶ 51    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2022). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2022). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the

child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2022).

¶ 52    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 53                                    1. Fitness

¶ 54    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Cory was an "unfit person." The trial court determined that the State met its burden of proof on the following three bases: (1) that Cory failed to maintain a reasonable degree of interest, concern, or responsibility as to C.J.'s welfare (*id.* § 1(D)(b)); (2) that Cory abandoned C.J. (*id.* § 1(D)(a)); and (3) that Cory deserted C.J. (*id.* § 1(D)(c)).

¶ 55              a. Reasonable Degree of Interest, Concern, or Responsibility

¶ 56    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App

19

(2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or her service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). "We are mindful *** that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 57   Here, the trial court concluded that Cory did not establish a reasonable degree of interest, concern, or responsibility toward C.J.'s return. While C.J. did spend several years in Cory's care and custody in West Virginia, after his 2018 incarceration, Elizabeth brought C.J. back to Illinois. Early in Cory's incarceration, he testified that he spoke to C.J. by phone. Elizabeth confirmed that she changed telephone numbers while he was in prison and did not provide Cory with her new number, which precluded further phone calls between Cory and C.J. Cory was released from prison in 2020. As of May 2023, Cory testified that he had had no contact with C.J. since that time. Elizabeth testified that throughout Cory's incarceration, he provided no money or items for C.J.

¶ 58 We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Elizabeth, Cory, and DCFS supervisor Sanborn. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). Having no communication and providing no support for the three years since he was released from prison establishes Cory's lack of interest, concern, and/or responsibility for C.J. Accordingly, we find that the trial court's finding on this ground is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 59                                              b. Abandonment

¶ 60 The State also alleged that Cory abandoned C.J. 750 ILCS 50/1(D)(a) (West 2022). The term "abandonment" means that the parent's conduct reflects a "settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Adoption of Mantzke*, 121 Ill. App. 3d 1060, 1066 (1984). The most important determination in an abandonment case is "whether the parent intended to abandon the child." *In re Joshua S.*, 2012 IL App (2d) 120197, ¶ 45.

¶ 61 Here, the trial court found that Cory was unfit on abandonment grounds despite his claim that his probation conditions prohibited contact with his daughter upon his release from prison. The court noted that his probation officer had informed him of the steps necessary to get a modification to allow contact with C.J., yet "[f]rom his release sometime in mid-2020 until early March 2023, he did nothing." The court also found that Cory exhibited an intent to abandon C.J. Upon his 2020 release from prison, Cory took no steps to seek modification of the West Virginia court order that precluded him from contact with C.J. Moreover, the trial court commented on Cory's complete failure to financially support C.J. or ask his girlfriend to get Elizabeth's current telephone number, which would not have been in violation of the court order. Finally, the court

21

took issue with Cory's lack of effort to reach out to DCFS upon his 2020 release from prison about his knowledge that DCFS was involved in C.J.'s case in Illinois. We conclude that the trial court's finding that Cory was unfit due to abandonment was not against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 62                                                     c. Desertion

¶ 63    The State finally alleged that Cory was an unfit person on the basis that he deserted C.J. (750 ILCS 50/1(D)(c) (West 2022)). "Desertion connotes conduct indicating an intention to permanently terminate custody over a child while not relinquishing all parental rights." *In re Dawn H.*, 281 Ill. App. 3d 746, 757 (1996). Using the same analysis regarding the abandonment findings, the trial court ruled that Cory deserted C.J. We find that the trial court's findings on this ground were not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 64                                                   2. Best Interest

¶ 65    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 323 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 66    At the best-interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2)

(West 2022); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 67    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2022). Those factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

23

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

The trial court is not required to make an explicit finding on each of the best-interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 68    During the best-interest hearing, DCFS caseworker Jenna Krause testified that C.J. was thriving in her foster placement and in school. She had lived with her current foster family for more than one year. Krause testified that C.J. was bonded with her foster parents and C.J. hoped that they would adopt her.

¶ 69    The trial court carefully reviewed and considered all best-interest factors before concluding that termination of Cory's parental rights was appropriate. The record clearly establishes that termination of Cory's parental rights was the appropriate outcome for C.J. We conclude that the trial court's decision to terminate Cory's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

24

¶ 70                              III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm the judgments of the circuit court of Shelby County finding that Cory was an unfit parent, and that the best interest of C.J. required the termination of his parental rights.

¶ 72    Affirmed.